Bruce B. SEVER, Plaintiff,

v.

DEPARTMENT OF COMMERCE,
Defendant.

Civ. A. No. 91–0340 (JHG).

United States District Court,
District of Columbia.

March 31, 1993.

Marni E. Byrum, Arlington, VA, for plaintiff.

Patricia D. Carter, Asst. U.S. Atty., Washington, DC, for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff Bruce B. Sever brought this action pursuant to the Age Discrimination in Employment Act ("ADEA"), codified at 29 U.S.C. § 633a, alleging that Mr. Sever was improperly terminated on the basis of his age and retaliated against for filing two Equal Opportunity Office ("EEO") complaints. In addition, Mr. Sever appeals the Merit Systems Protection Board's ("the MSPB") find-ing of no discrimination as either arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence. Defendant, in contrast, maintains that Mr. Sever was terminated because of unsatisfactory performance, and further that the Board's decision should be upheld as supported by substantial evidence and not arbitrary and capricious.

Upon consideration of the record and evidence introduced at the bench trial, including the testimony of witnesses whose credibility, demeanor, and behavior the Court has had the opportunity to evaluate, judgment is entered in favor of the defendant and against the plaintiff for the reasons stated below.

## I. FINDINGS OF FACT

### A. *Background*

At the time the discrimination is alleged to have occurred, Mr. Sever, a white male, born June 1, 1931, worked as an International Trade Specialist ("ITS") in the Office of Canada ("OOC") in the Department of Commerce ("DOC"). On November 17, 1989, when Mr. Sever's employment was terminated, he held a GS–12 classification, a rating he first attained in 1970.

Almost thirty years before he was removed from his job at the DOC, Mr. Sever began his career in 1961 at the DOC as an international economist and "desk officer" or "country specialist" for the International Trade Administration. During his tenure at the DOC, Mr. Sever acted as a country specialist for Thailand, the Caribbean, various South American countries, and Canada. In 1983, he was transferred to the OOC, but was initially assigned to issues concerning the Caribbean sector of OOC. Several years later in 1985, plaintiff began to work exclusively with Canadian issues.

From 1983 until October 1, 1987 when he retired, Thomas Brewer, the Director of OOC (born 1934), acted as plaintiff's first-line supervisor. William Cavitt (born in 1936) then became the Director of OOC and was technically Mr. Sever's first-line supervisor. However, because Mr. Cavitt was heavily involved in the Free Trade Act ("FTA") negotiations, he delegated much of his supervi-

sory duties to Kenneth Fernandez (born in 1930), who was subsequently promoted to a supervisory position. Ann Hughes (born in 1938), the Deputy Assistant Secretary for the Western Hemisphere was Mr. Sever's second-line supervisor until March 1988.

In 1986, the DOC experienced a budget crisis resulting from the Gramm–Rudman Act, and as a result, OOC was asked to determine whether any of its employees who were eligible to retire, were interested in doing so. A list of OOC employees eligible for retirement was distributed, which list contained plaintiff, Mr. Brewer, Mr. Fernandez and Randy Mye. A meeting was held between Mr. Brewer and the other employees on the list, at which time, Mr. Brewer attempted to ascertain if anyone wished to retire. All present, including Mr. Sever, informed Mr. Brewer that they did not wish to retire.[1] Several times during the next few months, Mr. Brewer checked with the employees on the list to see if there had been any change in their plans. After each individual responded negatively, Mr. Brewer terminated the inquiry. At approximately the same time, in October 1986, William Cavitt, Ms. Hughes' deputy, distributed a memorandum to her International Economic Policy ("IEP") staff, stating that "Pressure is still on to get eligible folks to retire voluntarily in order to avoid possible RIFS [reduction in force]. TD and FCS in much worse shape than IEP." Plaintiff's Exhibit 2A.

### B. *Plaintiff's Job and Job Performance at OOC*

The "Position Description" for Mr. Sever's job states that, as a general matter, an ITS, GS–12, is required to

perform research and analysis, and to provide reports, advice and consultations regarding the interplay of international trade policies between the U.S. and Canada and their major trading partners. The incumbent must author reports on the results of his/her research for use by senior policy makers. The position also requires the incumbent to counsel and assist the U.S.

private sector in exporting to and investing in Canada.

Plaintiff's Exhibit 1, at 102. The work requires "considerable initiative and originality to adapt, extend, alter, and/or apply these guidelines to work studies and projects of considerable breadth." *Id.* at 105. In addition, the position description states that job requires "conceptualization of large or complex problems with few precedents and numerous variables. Analysis often requires estimates because of the lack of specific country data." *Id.*

Ms. Hughes and Mr. Cavitt testified that in the spring of 1986, the FTA negotiations with Canada began to encompass a significant amount of OOC's time, fundamentally changing the nature of the work of OOC, as OOC began to provide assistance in the bilateral trade negotiations between the United States and Canada. As a consequence of this change, the responsibilities of OOC likewise changed from essentially commercial activities to trade policy analysis and formulation, often requiring demanding deadlines. Despite the expanded need for analysis, Mr. Cavitt stated that as a result of a determination that plaintiff could not adequately perform these increased duties, Mr. Sever's duties were limited to primarily business counseling. For example, during the FTA negotiations and while Mr. Sever was working essentially with Caribbean countries at OOC, his 1984–1985 performance evaluation contained the comment that:

In accomplishing these and other policy objectives and assignments, Mr. Sever tends to react rather than to initiate action. He seeks policy guidance from above, rather that [sic] attempting to develop the policy guidance to be recommended. This conceptual problem of his role in the policy-making process makes it more difficult for him to meet deadlines and cuts into the time he has available for other projects.

Defendant's Exhibit 1.

In 1987, Mr. Brewer informed Ms. Hughes that plaintiff was not performing adequately,

---

**1.** However, Mr. Brewer himself, decided to retire and did so—staying, as requested, only until the FTA negotiations were completed.

and as a result Ms. Hughes and Mr. Brewer met with plaintiff on March 12th to discuss Mr. Sever's performance. It was suggested that he be transferred to the Caribbean area, however, after objection by Mr. Sever, he was not transferred and instead remained in OOC. When asked why she did not nevertheless transfer Mr. Sever, Ms. Hughes testified convincingly that, as much as possible, she does not like to move people against their will; in her opinion, to do otherwise would be counterproductive.[2] Still, Ms. Hughes and Mr. Brewer did decide that it would be necessary to change plaintiff's responsibilities by assigning him more business counseling. Furthermore, Mr. Brewer stated that in order to give Mr. Sever a satisfactory performance rating, he had to skew Mr. Sever's assignments in order to place a heavy weight on business counseling.

Mr. Sever's April 1987—September 1987 performance appraisal reflected the change in duties, and as a result of this change, Mr. Sever received a "fully successful" rating with no significant problems noted. In fact, that 1987 evaluation reported that Mr. Sever had assumed responsibility for nearly one-half of the business inquiries received by the office, which the evaluator deemed helpful to the office during the FTA negotiations. Defendant's Exhibit 2.

On November 13, 1987, Mr. Sever filed his first formal complaint, alleging age discrimination. Shortly before that, in October 1987, after Mr. Cavitt replaced Mr. Brewer and promoted Mr. Fernandez to a GS–14 position so that Mr. Fernandez could supervise half of the OOC staff, Mr. Fernandez became plaintiff's first-line supervisor and completed plaintiff's October 1, 1987 through September 30, 1988 performance appraisal. Like the preceding appraisals, plaintiff received a "fully satisfactory" rating. However, Mr. Fernandez testified that the only reason Mr. Sever received a satisfactory rating was because he, Mr. Fernandez, had failed to adequately document Mr. Sever's unsatisfactory performance and had failed to inform Mr. Sever of his deficient performance. Mr. Cav-

itt confirmed this appraisal, noting that for the first half of the rating year, little attention had been focused on evaluating the staff. It was not until later in the evaluation year that Mr. Cavitt became aware that Mr. Sever was not performing adequately, but because of insufficient documentation of unsatisfactory performance, he concurred that Mr. Sever had to receive a satisfactory evaluation.

Notwithstanding the satisfactory rating, the comments on this performance appraisal indicate significant difficulties with Mr. Sever's work. Like the 1984–1985 appraisal, this performance appraisal noted that plaintiff's policy assignments "have been limited. This has been due in large part to the amount of guidance and supervision that Mr. Sever requires when assigned duties in the policy area." Defendant's Exhibit 3. Furthermore, the comments indicated that although his end work-product was good, the work was, at times, submitted later than it should have been. For example, instead of submitting a report on a subcommittee hearing within forty-eight hours of the event, Mr. Sever submitted the report several weeks after the fact. *Id.* At the end of the performance evaluation, Mr. Sever was warned that despite receiving a "fully successful" rating, he would need to raise the level of his performance to that expected of a GS–12. Failure to do so would not be deemed satisfactory in 1989. Mr. Sever filed his second administrative complaint on February 9, 1988, midway through this evaluation period.

### C. *The Performance Improvement Plan*

The next appraisal period covered October 1, 1988 through March 31, 1989, and in it, Mr. Sever received an unsatisfactory evaluation. As a consequence, he was placed on a Performance Improvement Plan ("PIP") on April 19, 1989, during which period, he was given ninety days in which to bring his performance to the satisfactory level. As part of the PIP, plaintiff attended biweekly meetings with Mr. Fernandez in order to review and assess his progress.

---

**2.** Nevertheless, Ms. Hughes testified that Mr. Sever's work product was poor and that he had difficulty in his oral presentations because of his

tendency to "ramble" and not come to the point. Transcript of *Sever v. Mosbacher,* Vol. 1, at 24.

Prior to the start of the PIP, Mr. Sever had been assigned an Industry Sector Analysis ("ISA") on the metalworking equipment industry in Canada. This particular ISA was requested by an official in the U.S. Consulate in Toronto for use in a trade show designed to familiarize American businessmen with the Canadian market and was initially assigned the due date of January 31, 1989. In order to assist in gathering information for the ISA (and because OOC had extra money to spend before the end of the fiscal year), plaintiff was authorized to travel to Toronto on August 22 to September 2, 1988. Mr. Sever evidently expected the staff at the U.S. Consulate to make his appointments in Toronto, and thus did not pre-arrange any meetings or visits to Canadian businesses prior to arrival. As a result of this failure, he was unable to learn as much as he had hoped. Then, on his return from Toronto, he failed to submit a requested outline by October 8, 1988. When Mr. Sever complained that his other office duties prevented him from completing the ISA, he was released from business counseling duties for two weeks prior to the January 1989 deadline for the ISA. When he did not meet the January deadline, he was next given the deadline of February 24th and again relieved of some business counseling [3] duties in order that he could complete the ISA. Plaintiff missed this deadline as well. The deadline was extended once again, now due on May 12th, and incorporated into Mr. Sever's PIP. Mr. Sever did not meet this deadline. Instead, on August 1, 1989, Mr. Sever informed his supervisors that it would take him a week to prepare a "picture of obstacles to and a target date of delivery of the paper." Finally, on August 3rd, many months after assignment, Mr. Sever was relieved of his ISA responsibility and the ISA was assigned to and completed by a GS–5 intern in three weeks.

Mr. Sever was also assigned the responsibility of answering a Congressional control letter. He received instructions regarding what should be said in the letter and when the letter was due. In spite of the deadline and the instructions given, the control letter was not timely answered because it required substantial revisions. This was the first missed deadline for a control letter at OOC in three years. In addition to not timely completing that control letter, plaintiff took seven and five weeks, respectively, to complete two routine cables.

Due to these and other deficiencies, Mr. Sever received an unsatisfactory evaluation of his mid-term progress during the PIP. Mr. Fernandez noted that plaintiff, like other OOC staff, should be able to handle routine business inquiries as well as other assignments. The evaluation stated further that Mr. Sever displayed "habitual delay" in accomplishing his work. The evaluation highlighted the importance of expeditiously completing the long overdue ISA. Defendant's Exhibit 29. A memorandum sent to plaintiff by Mr. Cavitt concerning plaintiff's PIP spoke of similar difficulties. For example, the memorandum noted that despite complaining that he had no uninterrupted time in which to complete his assignments due to telephone inquiries, Mr. Sever only answered an average of three calls a day during the PIP, which, according to his average length of answering time, should have comprised only thirty minutes of his day. Notwithstanding the fact that Mr. Cavitt believed he should be able to complete his other assignments, Mr. Cavitt took the additional step of relieving Mr. Sever from all inquiries, letters and telephones for an additional two weeks. Mr. Cavitt then explicitly informed plaintiff that he would be expected to have satisfactorily completed the ISA by the end of the PIP. Defendant's Exhibit 30. As previously noted, Mr. Sever did not complete the ISA by July 31, 1989 as directed and was subsequently terminated in November 1989.

## II. DISCUSSION

### A. *Alleged ADEA Violation*

 The "tripartite evidentiary scheme developed in the context of Title VII litigation [applies] to suits brought under the ADEA." *Krodel v. Young,* 748 F.2d 701, 705

---

3. Plaintiff spent twice as long as other desk officers responding to business counseling duties. An office study showed that he spent an average of ten minutes answering each call, as compared to the office average of five minutes per call.

(D.C.Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). Under this scheme, originally articulated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),

> an individual plaintiff claiming disparate treatment must first make out a *prima facie* case—*i.e.,* must demonstrate sufficient facts to create a reasonable inference that race, sex or age was a factor in the employment decision at issue. Once a *prima facie* case has been established, the employer bears a minimal burden of "producing evidence" tending to show that the plaintiff was denied employment or promotion for a legitimate nondiscriminatory reason. If the employer does so—and if his evidence is credible—the plaintiff must show by a preponderance of the evidence that the employer's asserted legitimate reason is a "pretext" for discrimination.

*Krodel,* 748 F.2d at 705. Despite the shifting stages in a disparate treatment case, the plaintiff never relinquishes the "ultimate burden" to prove that age was "a determining factor" in the challenged employment decision. *Id.* at 706 (citing *Coburn v. Pan Am. World Airways, Inc.,* 711 F.2d 339, 342 (D.C.Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983)). In other words, the plaintiff must prove that " 'but for' the discriminatory motive, the employee would have been hired, promoted or retained." *Krodel,* 748 F.2d at 706 (citing *Cuddy v. Carmen,* 694 F.2d 853, 858 & n. 23 (D.C.Cir.1982)).

▮ In the instant case, Mr. Sever has met the elements of a *prima facie* case of discrimination by demonstrating: (1) that as a fifty-five year-old individual at the beginning of the alleged discrimination, he falls within the statutorily protected age group; (2) that he had been performing satisfactorily until the 1987–1988 performance evaluation; (3) he was terminated; and, (4) employees not within the protected age group were not terminated. Moreover, Mr. Sever's *prima facie* case is bolstered by an inference of discrimination stemming from the fact that Mr. Brewer met with Mr. Sever and two other employees to discuss their retirement plans.[4] Accordingly, were the inquiry to end here, the Court could presume that the OOC acted discriminatorily in terminating Mr. Sever.

▮ But, the inquiry does not end with the *prima facie* case. The defendant has presented substantial credible evidence to the contrary and has in fact most persuasively articulated a legitimate, non-discriminatory reason for its action. As the evidence at trial demonstrated, well-documented instances of poor performance resulted in Mr. Sever's termination. Mr. Fernandez, Mr. Brewer, Mr. Cavitt, and Ms. Hughes each convincingly testified about Mr. Sever's shortcomings. Faced with increased responsibilities due to the FTA negotiations—responsibilities which should have been adequately performed by someone in Mr. Sever's position—they determined that Mr. Sever was not able to perform up to grade level. Even after being warned of specific deficiencies and after being given ninety days during which he could improve, Mr. Sever was not able to function adequately in the OOC.

For example, Mr. Sever's continued difficulties completing the ISA are illustrative of his inability to adapt to new problems, meet deadlines, or perform adequately as a GS–14 ITS at OOC. Coupled with the other deficiencies enumerated in the Factual Findings, the ten-month-long odyssey of the ISA clearly supports a legitimate, non-discriminatory reason for terminating Mr. Sever. Mr. Sever was given an assignment and a specific deadline and then several extensions of that original deadline. Moreover, although he had never before done an ISA, nor had anyone in OOC, the GS–12 ITS position description easily encompasses this type of assignment. Mr. Sever's job description stated

---

4. The Court acknowledges Mr. Sever's interpretation of the 1986 retirement meeting and subsequent short discussions solely for the purpose of supplying an inference of discrimination. This inference, however, was amply and credibly rebutted by Mr. Brewer and Ms. Hughes who stated that the inquiry was just that—an inquiry. No pressure was put on anyone to retire, in fact, the only person who announced he was going to retire, and did, was Mr. Brewer, the supervisor who held the retirement meeting. Moreover, Mr. Fernandez was one of the individuals present at the meeting who declined to retire and he was subsequently promoted.

that the position required "conceptualization of large or complex problems with few precedents and numerous variables. Analysis often requires estimates because of the lack of specific country data." Plaintiff's Exhibit 1, at 105. He was given sufficient time in which to prepare the report, he was sent to Canada to gather data, he was relieved of his business counseling responsibilities at different times in order to provide him with more time to work on the ISA, and yet Mr. Sever still complained that he could not do the project and the project was not completed. In light of the overall record, Mr. Sever's complaints that data did not exist and that he was not given enough direction are not valid excuses for not completing the project. As testimony disclosed, he could have used the information available to make estimates and complete the requested ISA, which even if not perfect, could have at least provided the reader with some information and could have been refined and revised as necessary later. Yet, despite repeated supplications to do so—importunings which continued during his PIP—Mr. Sever never even submitted a rough draft of the ISA. In sum, even though the DOC carries only the burden of producing evidence to show that Mr. Sever was denied employment for a legitimate, nondiscriminatory reason, the evidence presented at trial demonstrates conclusively that Mr. Sever was fired for cause.

In the end, Mr. Sever was unable to prove pretext; the record simply does not support a finding of discriminatory intent. First, as earlier summarized, the reasons advanced by defendant for terminating Mr. Sever after rating his performance as unsatisfactory are wholly credible. Second, the actions complained of and the decision to terminate Mr. Sever was made and approved by OOC employees, all whose ages fell within the statutorily protected age group. Although no employee younger than fifty was terminated, no evidence was presented that any other employee failed to perform satisfactorily, as did Mr. Sever. The only evidence presented by plaintiff to suggest that similarly situated employees were treated differently, was the fact that two other OOC employees were assigned ISAs and also did not complete the projects. Both Kathy Keim and Joseph Payne were assigned ISAs but were later informed that they did not need to complete them. It was determined that Mr. Payne's ISA was unnecessary because the OOC decided to publish a special edition of *Business America*, devoted chiefly to the subjects which would have been contained in his project, and as a consequence, his ISA was deemed redundant. On the other hand, it was decided that Ms. Keim's ISA was low on her priority list; her supervisors considered more important the other work she was doing. In contrast, Mr. Sever's supervisors still needed his assigned ISA for a scheduled trade show and therefore emphasized to him the importance of his prompt completion of the ISA, to the extent that he was relieved of other responsibilities in order to complete it. Mr. Sever was never told that he did not need to complete his ISA.

Last, despite his belief that he was being pressured to retire, Mr. Sever himself admitted that no one specifically questioned why he wanted to stay or asked him to leave. He based his belief that Mr. Brewer wanted him to retire on his interpretation of a statement made by Mr. Brewer stating that he, Mr. Brewer could not wait to "get out of here." In his testimony, Mr. Brewer candidly admitted that he was looking forward to retirement, and had been doing so since the day he started work. The Court can find nothing sinister in the fact that Mr. Brewer orally expressed his own wish to retire. Mr. Brewer and OOC cannot be held accountable for Mr. Sever's internal interpretation of a statement made by Mr. Brewer, which referred only to himself.

█ In addition to failing to prove discrimination by a preponderance of the evidence, Mr. Sever has not demonstrated reprisal. A *prima facie* case of reprisal requires that the plaintiff demonstrate that he has engaged in a statutorily protected activity, that the employer took an adverse action and that there was a causal connection between the two. *Barnes v. Small,* 840 F.2d 972, 976 (D.C.Cir. 1988) (citing *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984)).

█ Plaintiff has not met his burden. Assuming *arguendo* that plaintiff has made a

*prima facie* case of reprisal, plaintiff's claim fails because he cannot show by a preponderance of evidence that the legitimate, nondiscriminatory reason for plaintiff's termination, his poor job performance, was a mere pretext for retaliating against plaintiff for filing EEO complaints. As stated above, the evidence demonstrated that as the OOC became involved in the FTA negotiations with Canada, Mr. Sever could not adapt to the changing environment and was removed from his job for this reason, not because of age or reprisal. Exactly the same analysis applied to the ADEA claim applies here and dictates the conclusion that Mr. Sever's unsatisfactory job performance, not reprisal, resulted in his removal.

**B. Review of Merit Systems Protection Board's Decision**

■ Mr. Sever also challenges the finding of no discrimination reached by an administrative law judge ("ALJ") and affirmed by the MSPB. Generally, an appeal of a MSPB determination is filed in and reviewed by the Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1) (1988 & Supp. 1992). But where there is a separate claim of discrimination, the plaintiff is entitled to *de novo* review in a federal district court. *Id.* § 7703(b)(2). And, if the plaintiff raises both discrimination and distinct nondiscrimination claims arising from the MSPB determination, in other words, a "mixed case," the district court has jurisdiction over both types of claims. *Barnes v. Small,* 840 F.2d 972, 979 (D.C.Cir.1988); *Hayes v. Government Printing Office,* 684 F.2d 137, 140–41 (D.C.Cir.1982); *see Williams v. Department of Army,* 715 F.2d 1485 (Fed.Cir.1983) (en banc); *see also Archuleta v. Sullivan,* 725 F.Supp. 602, 605 (D.D.C.1989). Accordingly, this Court must also review the MSPB determination, and reverse it if it is found to be either: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule or regulation having

been followed; or (3) unsupported by substantial evidence. *See Barnes,* 840 F.2d at 979; *Phillips v. Postal Serv.,* 695 F.2d 1389, 1390 (Fed.Cir.1982). Unlike the *de novo* standard of review required by the ADEA, the Court's task in reviewing the administrative findings is significantly more deferential.

■ Before filing this complaint, Mr. Sever administratively challenged his termination. Four issues were presented to the agency: (1) whether the decision to remove plaintiff from his position was supported by substantial evidence; (2) whether the plaintiff was provided a reasonable opportunity to improve his performance; (3) whether age discrimination was a factor in plaintiff's removal; and, (4) whether the plaintiff was removed in reprisal for EEO complaints filed with the agency. On March 7, 1989, an ALJ resolved all four issues in favor of the DOC, determining that: the decision to remove Mr. Sever was supported by substantial evidence; he was provided a reasonable opportunity to improve his performance; discrimination was not a factor in the removal; and, there was no retaliation.[5]

The ALJ's finding that the decision to remove Mr. Sever from his position was supported by substantial evidence is itself supported by substantial evidence. For example, the ALJ examined the chronology of events leading up to Mr. Sever's inability to timely complete the assigned ISA and determined that Mr. Sever's explanation for his failure—that the ISA assignment was "make-work" and the agency had no use for the ISA—was not a defense. Unquestionably, an employee's unilateral belief that an assignment which properly meets the elements and standards of Mr. Sever's position is make-work and thus does not need to be done, does not constitute a defense to failure to perform. The assignment was given by a supervisor and should have been completed. Moreover, the conclusion that whatever problems Mr. Sever had were "surmountable" is fully supported by the factual finding that a

5. Because the last two issues have already been discussed, analyzed, and are subject to more exacting *de novo* review, they do not merit further discussion. Similarly, although the first two issues have also been discussed in the ADEA analysis, they are sufficiently distinct from a discrimination analysis; the analysis in the earlier section is not only adopted but these issues will be analyzed more fully in this section as well.

GS–5 intern completed the ISA in less than a month.

The ALJ concluded further that, in other projects, Mr. Sever had difficulty following instructions and complying with deadlines. For instance, as noted in the Factual Findings, *supra*, Mr. Sever did not timely complete several assigned cables. In addition to taking significantly longer than was normal to do the assignments, the drafts submitted by plaintiff required revisions. In a similar vein, the ALJ concluded that Mr. Sever did not adequately answer a congressional control letter. He did turn in the draft by his due date, but failed to anticipate that time would be needed in order to incorporate revisions by the assigned deadline. In sum, the ALJ's conclusion that the agency could properly consider the plaintiff's work deficient is fully supported by the evidence.

In his administrative appeal, Mr. Sever also challenged the time he was given to improve his performance prior to removal. In reaching the conclusion that the ninety days provided by the agency were sufficient to afford Mr. Sever a reasonable opportunity to improve his performance, the ALJ found that Mr. Sever was specifically informed of the deficiencies in his performance and advised of what he needed to do in order to perform satisfactorily. *See Jones v. National Gallery of Art*, 36 M.S.P.R. 602, 604 (1988), *affirmed*, 864 F.2d 148 (Fed.Cir.1988) (Table). Biweekly meetings were held in order to assess and provide guidance, and furthermore, plaintiff never argued that his assignments were inappropriate under his job standards. The ALJ did not consider valid Mr. Sever's argument that he lacked sufficient experience to do the assigned tasks. Since Mr. Sever was given assignments not outside of his job description, his deficiencies were brought to his attention, and he was instructed how to bring his performance up to standard, the agency's decision that Mr. Sever's improvement opportunity was reasonable is also supported by substantial evidence.

## III. CONCLUSION

For the reasons stated above, the Court concludes that plaintiff's termination did not violate the ADEA. Additionally, the decision by the MSPB was fully supported by the facts and in accordance with law. Accordingly, judgment is entered on the accompanying judgment page in favor of the defendant, the Department of Commerce, and against the plaintiff, Bruce B. Sever.

IT IS SO ORDERED.